# H. C. & W. B. Reynolds Co. *v.* Reynolds, *et al.*

### *Bill to Divest and Invest the Legal Title to Property.*

(Decided November 7, 1914. Rehearing denied January 14, 1914.
67 South. 293.)

1. *Trusts; Resulting; Consideration for Conveyance to Corporate Officers.*—Where property was bought by the treasurer of a corporation with money belonging to the corporation, and title was taken in his own name, the property was the property of the corporation, and after such treasurer's death, his personal representative and heirs were the holders of the legal title for its benefit.

2. *Same; Establishment; Cross Bill.*—In a bill by a corporation against the personal representative and heirs of its deceased treasurer to have property purchased with its money, the legal title to which was taken in the treasurer's name, declared to be held for the corporation's benefit, a banking and trust company, which, in reliance on the treasurer's apparent ownership had advanced money

[II. C. & W. B. Reynolds Co. v. Reynolds, et al.]

to third persons on his credit, was properly allowed to file a bill in the nature of the cross bill to establish its rights as against the corporation.

3. *Equity; Cross Bill; Reference to Matter in Original Bill.*— Where the original bill was filed by a corporation to enforce a trust in property purchased with its money, the cross bill might properly refer to matters of description in the original bill, and adopt them as part of the cross bill, and, while a cross complainant is not required to plead any matters set up in the original bill, he may shorten his cross bill by reference to pleadings already on file.

4. *Same; Original Bill and Nature of.*—A cross bill is allowed to enable one, not a party to the original suit, to come into the cause and show his right to be heard therein, by appropriate averments, and, by appropriate process, bring before the court those parties who claim interest adverse to him; the distinction between an original bill in the nature of a cross bill, and a mere cross bill being that the latter is filed in a cause by a party thereto, and seeks the enforcement of an equity germane to or springing out of the subject matter of the original bill, while an original bill in the nature of a cross bill is a pleading filed by leave of the chancery court by a person not a party to the original bill, and between whom and complainant, there is no privity.

5. *Trusts; Bill to Establish; Pleading; Insolvency.*—Where the original bill was by a corporation against the legal representatives and heirs of its deceased treasurer to establish a resulting trust in lands alleged to have been purchased with the money of the corporation, an original bill in the nature of a cross bill denying that the property had been purchased with the money of the corporation, and alleging that the corporation was estopped from establishing a trust as against cross complainant's debts against the deceased treasurer, and also alleging that if complainant was granted the relief prayed for in its bill, and the property described therein was declared to be its property, then the estate of the deceased treasurer was insolvent sufficiently averred insolvency without pleading facts from which it might be deduced.

6. *Same; Rights of Third Parties.*—Where a corporation, the stock and control of which was held by members of the same family, allowed the treasurer, who was also in charge of one of its business branches, to purchase property with the money of the corporation, which, although the rents and management were attended to by the corporation, stood in the name of its treasurer, so that cross complainant, a trust company, had made loans to third parties on the security of his credit, and was actually misled by his apparent ownership of the property, the corporation was chargeable with such culpable negligence as estopped it from establishing a trust in the property as against the representative and heirs of the deceased treasurer, and from defeating the claim or lien of the trust company, the rule being where some one must lose by reason of such negligence, the one that reposed the trust should lose rather than a stranger relying thereon.

APPEAL from Bibb Chancery Court.

Heard before Hon. THOMAS H. SMITH.

Bill by H. C. & W. B. Reynolds Company, against E. D. Reynolds and others, to declare and enforce a resulting trust in lands, with original bill in the nature of a cross-bill by the Bibb County Banking & Trust Company, to enforce its claim or lien against the property. From a decree sustaining the cross complainant, the complainant appeals. Affirmed.

JOHN P. TILLMAN, HENRY P. WHITE, and LAVENDER & THOMPSON, for appellant.

LOGAN & LOGAN, for appellee.

DE GRAFFENRIED, J.—H. C. & W. B. Reynolds Company, a corporation, was, for a long time, engaged in a general mercantile business in Bibb county. The great bulk of the stock of the corporation belonged to H. C. Reynolds, Sr., and to members of his immediate family, among them being his sons, E. D. Reynolds and H. E. Reynolds, deceased.

There appears to have been two mercantile establishments, one at Centerville and the other at Blocton. H. E. Reynolds, deceased, had charge of the business at Centerville, and E. D. Reynolds at Blocton. H. E. Reynolds, deceased, was the treasurer of the corporation, and he seems to have been given a free hand in the management of the mercantile establishmnt at Centerville.

The evidence all shows that the said H. E. Reynolds (who died in 1911) was a man of excellent character, business ability, and habits, and that he deservedly possessed the confidence and esteem of his father, who was the president of the corporation, and of the other stockholders of the corporation. On this subject we quote with approval the following from the opinion of the chancellor, which we find in the record: "There is noth-

ing in the evidence nor in this record to justify any imputation of improper motives to H. E. Reynolds or to these complainants. They had the utmost confidence in each other, and no doubt in the world the title was taken in H. E. Reynolds for no ulterior motives or with any but the most correct and upright intentions, and had he lived no litigation would ever have arisen. His widow has acted in the most generous, disinterested manner, and with no other purpose than to carry out the wishes of her husband, and do what she considered just and right, without regard to her own pecuniary interest. Nor do I consider that solicitors for cross-complainants have argued otherwise."

It appears that at the time of his death the said H. E. Reynolds, deceased, thought that he was, and probably was, solvent. His estate, when the bill in this case was filed, was insolvent, and this insolvency may be, and probably was, due to a misfortune to the Cleveland Mercantile Company, in which he was interested at the time of his death, and which misfortune befell the Cleveland Mercantile Company after his death. The said H. E. Reynolds, deceased, at the time of his death, was legally bound to the Bibb County Banking & Trust Company on some of the debts of the Cleveland Mercantile Company, and this liability is the mainspring of this litigation.

It appears that after the formation of the H. C. & W. B. Reynolds Company the said H. E. Reynolds, deceased, bought, with money of said H. C. & W. B. Reynolds Company, certain tracts of land and certain personal property, and took the title in his own name. This property was not bought at one time, but at several different times, stretching over a period of several years; and it is conceded that all of it was paid for out of funds of the H. C. & W. B. Reynolds Company.

It further appears that on the books of the H. C. & W. B. Reynolds Company all of this property was treated as the property of the company. The rents received from the property, the taxes paid out on the property, and the property itself, were, on the books and among the stockholders of said corporation, treated as matters of said H. C. & W. B. Reynolds Company. It is not claimed or suggested that H. E. Reynolds, deceased, took the title to this property—and a large part of it was purchased several years before his death—in his own name for evil or improper purposes. He may have taken the title in this way as a matter of convenience merely, but in his treatment of the property, in so far as the outside world was concerned, he treated it, handled it, and spoke of it as his own. The deeds were recorded, and they showed the title to be in him. When any of the property was sold, he conducted the negotiations for, and concluded, the sale. The deeds to such properties were signed by him and his wife, and the purchase money was itself paid to him. If all of the purchase money on such a sale was not paid in cash, notes were made to H. E. Reynolds for the deferred purchase money, and these notes were secured by mortgages to said H. E. Reynolds, and the mortgages were regularly recorded. He rented out the property, assessed it in his own name, was, in so far as his tenants and the world knew, in sole possession of it and the sole owner of it, and he spoke of it as his own. The stockholders of the H. C. & W. B. Reynolds Company knew that he did not own the property, but the business world regarded him as its owner.

(1) 1. The original bill of complaint in this cause was filed by the H. C. & W. B. Reynolds Company against the administrators of the estate and the heirs and distributees of the said H. E. Reynolds, deceased,

and prayed that the legal title to the property, to which we have above referred, be divested out of them and vested in the complainant. The theory of the complainant is that, as the property was bought with the money of complainant, the property was and is the property of the complainant, and that said H. E. Reynolds, deceased, was, and after his death his personal representatives and heirs were, the holders of the legal title for the benefit of complainant.

The bill of complaint, of course, contains equity; and the personal representatives and heirs of said H. E. Reynolds, deceased, in no way dispute the right of the complainant to the relief prayed for in its bill of complaint.

(2) 2. Upon the application of the Bibb County Banking & Trust Company, leave was given the bank to assert its rights in this matter by an original bill in the nature of a cross-bill. Some discussion is had in briefs of counsel as to whether the Bibb County Banking & Trust Company had the right to file in this cause the pleading which it has filed upon leave of the chancellor, but we think that the cases of *Renfro v. Goetter, Weil & Co.*, 78 Ala. 314, and *Ex parte Gray*, 157 Ala. 363, 47 South. 286, 131 Am. St. Rep. 62, cited by the chancellor in his decree upon the petition of said bank to be allowed to intervene, are decisive of that question. In this case the bank was not a party to the original cause, and there was no privity between it and the complainant in the original cause. It was interested, however, in, but possessed no lien upon, the subject-matter of the suit. Leave to file a bill in the nature of a cross-bill was, under our practice, therefore, necessary, and such a pleading furnishes the appropriate remedy for said bank.—*Ex parte Gray, supra.*

3. This entire litigation, in so far as this appeal is concerned, grows out of the pleading which was filed in this cause by said bank, and to which all of the parties to the original cause were made parties.

In its bill in the nature of a cross-bill the bank denies that the purchase money of the property described in the original bill was furnished by complainant, claims that the original bill was filed to divest the title of the personal representatives and heirs of H. E. Reynolds, deceased, to the property described therein, for the purpose of defrauding the bank, and then, in the alternative, alleges that, if the money which was used by H. E. Reynolds in buying the property was in fact the money of the said H. C. & W. B. Reynolds Company, then the said H. C. & W. B. Reynolds Company is estopped from setting up its claim to the property as against the debt of the bank, because, so the bill in the nature of a cross-bill alleges, the said H. C. & W. B. Reynolds Company permitted the said H. E. Reynolds, deceased, to hold himself out to the world as the owner of said property, and upon the faith of his ownership of the property the bank had extended to him credit and permitted him to contract the indebtedness to the bank. The bill in the nature of a cross-bill alleges that if the complainant is granted the relief prayed for in its bill of complaint, and the property described in the original bill is declared to be the property of the complainant, then the estate of H. E. Reynolds is insolvent.

(3, 4) We can seen no reason why, in such a cross-bill, reference may not be had to the original bill, and we see no reason why, in such a cross-bill, matters of description in the original bill may not be referred to and, to save unnecessary repetition, adopted as a part of the bill in the nature of a cross-bill. Such a cross-

bill is allowed by the court for the purpose of enabling one not a party to the original suit to come into the cause and, by appropriate averments, show his right to be heard in the cause, and by appropriate process in this matter bring before the court those parties who claim interests adverse to him. The prominent distinction between an original bill in the nature of a cross-bill, and a mere cross-bill, is that a cross-bill is filed in a cause by a party to the cause and seeks the enforcement of an equity touching, germane to, or springing out of the subject-matter of the original bill, while an original bill in the nature of a cross-bill is a pleading filed by leave of the chancellor, by a person not a party to the original suit, and between whom and the complainant there is no privity. In such a pleading the cross-complainant undertakes, for his own protection, to assert a new and independent claim, which touches the subject-matter of the controversy between the parties to the original suit. When such an original bill in the nature of a cross-bill is filed by proper leave, and in an appropriate way, the cross-complainant, for which he is permitted to file the bill, becomes, in fact, a party to the cause and is dealt with by the chancellor as such. While such a party is not required to state in his pleading any of the matters which have been set up in the original bill, we see no reason why he may not shorten his pleading by referring to the pleadings already on file and, if he sees proper, by making parts of them his own. Indeed, it would appear to be the better practice for him to do so. "Vain repetitions" are useless in pleadings, as well as in everything else that human beings undertake to do.

(5) We not only think that the chancellor, for the above reasons, committed no error in overruling the demurrer to the original bill in the nature of a cross-

bill, but we also think that the original bill in the nature of a cross-bill, sufficiently alleges, as a fact, the insolvency of the estate of H. E. Reynolds, deceased. We have already stated what the bill in the nature of a cross-bill alleges with reference to the insolvency of the said estate. If it be true that a man is insolvent, and it is necessary to allege his insolvency in a pleading, then we see no reason why a pleader may not, without stating any particular facts, simply allege the bald fact of insolvency. A pleading which alleges that a man is insolvent states a situation which is well defined, and we see no reason why the pleader should be required to state facts from which his insolvency can be adduced.—*Bank v. Ellis,* 30 Ala. 478.

If the allegations of the original bill are true, the complainant, as against the respondents and all others, except those possessing some peculiar equity, is entitled to all of the property described in the bill. This being true, the statement in the supplemental pleading of appellee that "if the prayer of said original bill of said H. C. and W. B. Reynolds Company hereinbefore referred to prevails, and said title is divested from the personal representatives and heirs of H. E. Reynolds, the estate of H. E. Reynolds will be insolvent," read in connection with the original bill, is a plain allegation that the estate is, in fact, insolvent. Of course, this allegation of fact, just as all other allegations of fact, is one which goes to the right of recovery, and must be supported by proof.

4. The bill in the nature of a cross-bill in this case possesses none of the elements of a general creditors' bill. In one aspect the pleading is an effort on the part of the pleader to prevent the divestiture of title out of respondents to the property, and it is not an effort to have an existing conveyance declared to be, as against

creditors, null and void. In the other aspect the pleading is an effort on the part of the pleader to have fastened upon the property described in the bill of complaint a lien in its favor, upon the ground that, as against the debt of the bank, the complainant is estopped from laying claim to the property. The special equity, in so far as the estoppel is concerned, grows out of the oft-quoted doctrine that: "Wherever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it."—*Noble v. Moses,* 74 Ala. 604.

5. H. E. Reynolds, deceased, was, from all the evidence, a man of much activity in business. He was not only the general manager of a large mercantile establishment at Centerville (the principal mercantile establishment of complainant), but he was a man whose activities were engaged in some of the enterprises of his vicinity. He possessed an excellent character, and his influence probably dominated in all of the activities in which he was engaged. So long as he retained his health, the business over which he exerted an influence seems to have prospered. Indeed, some time prior to his death the mercantile establishment of complainant at Centerville seems to have been disposed of, and H. E. Reynolds, deceased, became interested in, and was the dominant figure in, the Cleveland Mercantile Company, a corporation, which not only owned a stock of merchandise at Centerville, and was engaged in mercantile pursuits at that place, but which also owned two branch mercantile establishments in the state of Mississippi. The major portion of his time for a year or two before his death seems to have been spent in Mississippi, but the business men of Centerville recognized him as the guiding authority in the matters in which he was interested in Bibb county, and the bank there

seems to have largely confined the credit which it extended to the Cleveland Mercantile Company to loans which were not only made with his knowledge and approval, but largely to those only upon which he personally bound himself. In other words, the bank, when it knew that H. E. Reynolds approved of a loan to the said Cleveland Mercantile Company, and that he himself personally bound himself to pay it at its maturity, made the loan, and it was usually only upon such conditions that it made a loan to said Cleveland Mercantile Company.

At the times these loans were made to the Cleveland Mercantile Company, the bank regarded that company as solvent, but, from the entire history of these transactions, we are satisfied that the bank felt that a risk of any size upon that company was desirable, only when it was made with the knowledge of H. E. Reynolds, deceased, and when the paper of said company, evidencing the loan, was properly indorsed by said H. E. Reynolds, deceased. When such a paper above described was offered to the bank, its officers recognized that upon it, as an indorser, was the name of a man who had prospered in business in Centerville, who was one of the mainsprings of its business world, and whose investments in real estate in that community indicated a substantial, growing increase in prosperity and wealth. While these investments in real estate were not intended to deceive, they must have, in the ordinary course of things, misled the members of that community as to the actual financial condition of said H. E. Reynolds, deceased, and that condition was created by the passiveness of the H. C. & W. B. Reynolds Company. The doctrine of culpable negligence penalizes inactivity, and through it the sins of omission—the failure to do that which should be done—are visited with

the same character of penalties as are the sins of commission. In small towns and communities investments in real estate do not go unheeded. The sale of a plantation brings on a discussion in the community, and the reasons for its sale, on the one hand, and for its acquisition, on the other, are usually given with remarkable freedom. The purchase of a town lot brings the seller and the purchaser into discussion upon the street corners and in the places where people are accustomed to congregate in their moments of leisure. The ownership—and the continued acquirement—by an individual of unincumbered desirable real estate is accepted as an indication of business prosperity on the part of that individual, and necessarily increases his standing and credit as a man of affairs. In such a community the commercial rating of an individual member of the community is rarely looked to. His visible property is the thing that usually counts.

6. The H. C. & W. B. Reynolds Company was, as we have already said, a close corporation. Substantially all of its stock was owned by a father and his sons. These people had confidence in each others, and they especially placed their confidence in H. E. Reynolds, deceased. He was a business man, and knew how to handle himself in his dealings with the world. He was solvent, and but for a misfortune, which business foresight could not have anticipated—and such misfortunes sometimes strike the entire business world unawares— and which misfortune befell his estate some time after his death, this litigation would not only not have occurred, but there would have been no reason for such litigation. This being the situation, the H. C. & W. B. Reynolds Company did not exercise that business supervision over the acts and doings of said H. E. Reynolds as one of its general managers, which it should have

done. For several years property was accumulated by H. E. Reynolds, deceased, in his own name, with the funds of the H. C. & W. B. Reynolds Company, stood in his name and in his possession, was managed, controlled, and claimed by him as his own, and naturally misled the business public and the bank at Centerville as to his actual wealth. In none of his business negotiations with the bank did he actually represent that the property described in the original bill belonged to him, but the record of his conveyances, his course of conduct, and the course of conduct of the H. C. & W. B. Reynolds Company were there proclaiming his ownership of the property. It is true that at least a large part of the property—bought along, at various times, through a series of years—was paid for in checks drawn by H. E. Reynolds upon said bank, to which the name of H. C. & W. B. Reynolds Company was signed, and which checks were charged up by the bank to the account of the H. C. & W. B. Reynolds Company. The checks which were drawn by H. E. Reynolds, upon said bank, to which he signed the name of H. C. & W. B. Reynolds Company, were numerous, and upon that subject we quote with approval the following from the opinion of the chancellor, on file in this cause: "It appears that part of the lands were bought as early as 1903, and 5 other tracts of land were bought from that date on down to 1909, during which time title stood in the name of H. E. Reynolds, and, so far as the evidence discloses, no attempt was made, until the filing of the original bill in this cause, to assert a resulting trust in the complainants. During this time H. E. Reynolds secured by his credit with the bank the loans sought to be collected by its intervention in this cause. The undisputed testimony is that the apparent ownership of the land was in him. No notice was given the

bank that the lands were not his, nor was the mere fact
that the checks, with which H. E. Reynolds paid for
them, were drawn by him on the funds of H. C. & W.
B. Reynolds Company, notice to the bank of the assert-
ed secret equity. He drew many checks in this way.
and the bank cannot be charged with notice of the claim
that the purchase was for the firm, or of their unas-
serted claim to the land."

(6) 7. Without regard to the actual knowledge which
the officers and agents of the H. C. & W. B. Reynolds
Company may have had of the above transaction—and
we believe them when they say that they had no actual
knowledge of the transaction—we have here a corpor-
ation which, because of infinite trust in one of its offi-
cials, has permitted, for a number of years, a course
of dealings on the part of that official which was cal-
culated to mislead, and had actually misled, a business
community as to the financial situation of that official,
and which has finally resulted in a loss which must
either fall upon an innocent third party or the corpor-
ation. That equity must place that loss upon the negli-
gent corporation there can be no doubt. The man, H.
E. Reynolds, deceased, who developed the situation, was
innocent of all wrongful purposes. The confidence
which was placed in him by his father and brothers
was not unnatural, but the business men of the Cen-
terville community had a right to rely upon .the rea-
sonable business diligence of the H. C. & W. B. Rey-
nolds Company, and this business diligence it failed to
observe.—*Stevens v. Dennett*, 51 N. H. 324.

8. It must be remembered that, in this case, a court
of equity is appealed to by the H. C. & W. B. Reynolds
Company, after the insolvency of H. E. Reynolds, de-
ceased, to divest the legal title out of the estate of H.
E. Reynolds, deceased, and vest it in the said H. C. &

W. B. Reynolds Company. This is not the case of a trustee owing debts, who has conveyed the legal title to his cestui que trust, and which conveyance is attacked as fraudulent and void by the creditors of the trustee, as was the situation in the case of *Blake v. Meadows*, 225 Mo. 1, 123 S. W. 868, 30 L. R. A. (N. S.) 1; *Bell v. Stewart*, 98 Ga. 669, 27 S. E. 153; *Alkire Groc. Co. et al. v. Ballenger et ux.*, 137 Mo. 369, 38 S. W. 911; *Marston et al. v. Dresen et ux.*, 85 Wis. 530, 55 N. W. 896; *Dodd et al. v. Bond*, 88 Ga. 355, 14 S. E. 581; *Bicochi v. Casey-Swasey Co. et al.*, 91 Tex. 259, 42 S. W. 963, 66 Am. St. Rep. 875; *Garner v. Bank*, 151 U. S. 420, 14 Sup. Ct. 390, 38 L. Ed. 218.

A careful analysis of the above cases will clearly show that they are really founded upon the common-law principle—changed by statute in this state—that: "A conveyance by a debtor of his own property in discharge of a debt, though taken by the grantee with the knowledge that it is intended to hinder, delay, or defraud other creditors, is good as against the latter, unless the grantee takes more than the amount of his debt, either for himself, or for the debtor or others."—*Dodd et al. v. Bond, supra; Garner v. Bank, supra.*

Each of the above cases, as well as each of the following other cases cited by counsel for appellant in their brief, was a case in which the court protected the property of the wife from plunder at the hands of the husband or his creditors, viz.: *In re Garner* (D. C.) 110 Fed. 123; *Huot v. Reeder*, 140 Mich. 162, 103 N. W. 569; *Mayor v. Kane*, 69 N. J. Eq. 733, 61 Atl. 374, and *Murphy v. Clayton*, 113 Cal. 153, 5 Pac. 267.

It is true that in some of the above cases the broad doctrine is announced that: "To constitute such an estoppel, it must * * * be shown that the person sought to be estopped has made an admission or done

an act, with the intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, inconsistent with the evidence he proposes to give or the title he proposes to set up; that the other party has acted upon or been influenced by such act or declaration; that the party so influenced will be prejudiced by allowing the truth of the admission to be disproved."—*Murphy v. Clayton, supra.*

In none of those cases, however, did the court have, as in this case, progressive or successive investments, stretching over a period of years, by an agent of a business man, of the money of his principal, in the name of the agent, whereby the people residing in the community were actually misled as to the real worth and business success of such agent. In other words, in the above cases, the courts were dealing with situations which sprang out of the violation by the husband of a duty which he owed his wife—situations growing out of the marital relation—and they were not dealing with a case where a business man had been so culpably negligent of his own affairs as to permit an agent, for a successive period of years, to invest the money of his principal in visible property, in his own name, and assume towards that property so bought during such succession of years the attitude of an absolute owner, in so far as the outside world was informed.

The situation developed in this case probably grew out of the fact that the H. C. & W. B. Reynolds Company was a family affair, and that H. E. Reynolds probably felt that he possessed a license which he otherwise would not have taken with the affairs of the corporation. As to the general public, however, the H. C. & W. B. Reynolds Company was a business corporation, and H. E. Reynolds, deceased, simply one of its general agents. A person, who willfully or through cul-

pable negligence enables another to hold himself out to the public as the owner of property, is estopped from claiming that property as against one who has been misled in dealing with the apparent owner of the property and upon the faith of that ownership.—2 Herman on Estoppel, p. 1103, subd. 979.

"Seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver should be loser than a stranger."—*Hern v. Nichols*, 1 Salkeld 289; *Allen v. Maury*, 66 Ala. 10.

"A recognized proposition as to estoppel in pais is that if in the transaction itself, which is in dispute, a party has led another into the belief of a certain state of facts by conduct of culpable negligence calculated to have that result, and such culpable negligence has been the proximate cause of leading, and has led, the other to act by mistake upon such belief to his prejudice, he cannot be heard afterwards, as against that other, to show that the state of facts referred to did not exist."—16 Cyc. p 772, and authorities there cited.

"The rule has sometimes been stated," says Pomeroy, "as though it were universal, that an actual knowledge of the truth is always indispensable. It is, however. subject to so many restrictions as to lose its character of universality. It applies in its full force only in cases where the conduct creating the estoppel consists of silence or acquiescence. It does not apply where the party, although mistaken or ignorant as to the real facts, was in such a position that he ought to have known them, so that knowledge would be imputed to him. In such case ignorance or mistake will not prevent an estoppel. Nor does the rule apply to a party who has not simply acquiesced, but who has actively interfered, by acts or words, and whose affirmative con-

duct has thus misled another. Finally, the rule does not apply, even in cases of mere acquiescence, when the ignorance of the real facts was occasioned by culpable negligence."—2 Eq. Jud. § 980; *Sullivan v. Colby,* 71 Fed. 460, 18 C. C. A. 193.

The case of *Goldthwaite, Receiver, v. Janney & Chaney, Trustees,* and *Abraham v. Same,* 102 Ala. 431, 15 South. 560, 28 L. R. A. 161, 48 Am. St. Rep. 56, did not present the facts which are presented by this record, and in no way conflicts with the above views.

9. We think that the conclusions of the chancellor on the facts of this case, as presented by the legal evidence, were in accordance with the great weight of the testimony, and we are of the opinion that his decree should be affirmed.

10. There are some matters of minor importance which we have not above discussed. We have carefully examined them, and are of the opinion that the chancellor was correct in his rulings as to all of them.

The decree of the court below is affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.